IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **OLGA JEAN WALLEN,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:15cv00006 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| Defendant | ) | By: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Olga Jean Wallen, ("Wallen"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Wallen protectively filed an application for DIB on April 5, 2012, alleging disability as of March 31, 2012, due to osteoporosis; arthritis; back and leg pain; asthma; hypertension; high cholesterol; and ear problems. (Record, ("R."), at 167-69, 185, 189.) The claim was denied initially and on reconsideration. (R. at 92-94, 99-102, 104-06.) Wallen then requested a hearing before an administrative law judge, ("ALJ"). (R. at 107-08.) A hearing was held by video conferencing on January 9, 2014, at which Wallen was represented by counsel. (R. at 32-70.)

By decision dated February 21, 2014, the ALJ denied Wallen's claim. (R. at 19-28.) The ALJ found that Wallen met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2016. (R. at 21.) The ALJ also found that Wallen had not engaged in substantial gainful activity since March 31, 2012, her alleged onset date.[1] (R. at 21.) The ALJ found that the medical evidence established that Wallen suffered from severe impairments, namely arthritis of the neck and back; mild degenerative disc disease; osteoporosis; asthma; and hypertension, but he found that Wallen did not have an impairment or

---
[1] Therefore, Wallen must show that she became disabled between March 31, 2012, the alleged onset date, and February 21, 2014, the date of the ALJ's decision, in order to be entitled to DIB benefits.

-2-

combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21.) The ALJ found that Wallen had the residual functional capacity to perform sedentary work[2] that did not require more than occasional exposure to pulmonary irritants. (R. at 22.) The ALJ found that Wallen was unable to perform her past relevant work. (R. at 26.) Based on Wallen's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Wallen had acquired work skills from her past relevant work that were transferable to other occupations that existed in significant numbers in the national economy that Wallen could perform, including jobs as a proof machine operator, a statement clerk and a collections clerk. (R. at 26-27.) Thus, the ALJ found that Wallen was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 28.) *See* 20 C.F.R. § 404.1520(g) (2015).

After the ALJ issued his decision, Wallen pursued her administrative appeals, (R. at 14), but the Appeals Council denied her request for review. (R. at 1-3.) Wallen then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2015). The case is before this court on Wallen's motion for summary judgment filed November 13, 2015, and the Commissioner's motion for summary judgment filed December 17, 2015.

---

[2] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2015).

*II. Facts*

Wallen was born in 1952, (R. at 168), which classifies her as a "person of advanced age" under 20 C.F.R. § 404.1563(e). She has a high school education and past work experience as a bank teller. (R. at 36, 38, 190.) She stated that she could not work due to back pain. (R. at 42.) She stated that she received chiropractic treatment on her back which improved her condition. (R. at 47.) Wallen stated that she could stand in one spot for up to 10 minutes without interruption. (R. at 53.) She stated that she could sit for up to 30 minutes without interruption. (R. at 53.) Wallen stated that she could walk a street block on a flat surface without stopping on most days. (R. at 53.) She stated that her back pain impacted her ability to concentrate. (R. at 56.)

Vocational expert, Mark A. Hileman, also testified at Wallen's hearing. (R. at 39-40, 59-68, 154.) Hileman classified Wallen's work as a bank teller as light[3] and skilled. (R. at 39.) Hileman stated that there were four occupations listed in the financial institutions at the sedentary level that would utilize Wallen's transferable skills. (R. at 39.) He identified the jobs of a proofing machine operator, a statement clerk, a collection clerk and a mortgage closing clerk.[4] (R. at 40.) Hileman was asked to consider a hypothetical individual of Wallen's age, education and work experience, who would be limited to sedentary work that did not require more than occasional exposure to pulmonary irritants and chemicals. (R. at 59-60.) Hileman

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2015).

[4] Hileman later testified that the job of mortgage closing clerk would be eliminated due to the lack of transferability of skills and that the job would have to be learned. (R. at 66-67.)

-4-

stated that such an individual could perform the three jobs previously identified. (R. at 60.) Hileman was asked to consider an individual who could stand, walk and sit a total of only three to four hours and who would need to take breaks to lie down. (R. at 63.) He stated that there would be no jobs available that such an individual could perform. (R. at 63.) Hileman stated that, if the individual experienced frequent interference with attention and concentration, it would interfere with the three jobs he identified. (R. at 68.)

Hileman was asked to consider Social Security Ruling 82-41, ("SSR 82-41"), to determine if the jobs that he identified would still be viable. (R. at 63-65.) He stated that transferability skills are determined by the work field that the work is in; the material products, subject matter and services; and whether or not the specific vocational preparation, ("SVP"), level ranks with the previous job. (R. at 65-66.)

In rendering his decision, the ALJ reviewed medical records from Dr. Robert McGuffin, M.D., a state agency physician; Dr. Wyatt S. Beazley, III, M.D., a state agency physician; Lonesome Pine Hospital; Stacey Gipe, P.A., a physician's assistant; Dr. James Wesley Campbell, D.O.; Appalachian Physical Therapy & Sports Clinic; and Cloverleaf Chiropractic.

On October 12, 2009, Wallen was seen by Stacey Gipe, P.A., a physician's assistant at Appalachian Healthcare Associates, P.C., ("Appalachian Healthcare"), for complaints of low back pain. (R. at 276.) Examination showed that Wallen could forward flex "very little" due to pain; she had good backward extension in

-5-

Case 2:15-cv-00006-PMS   Document 15   Filed 06/01/16   Page 5 of 15   Pageid#: 465

full lateral bends and twists; straight leg raising tests were negative; she had good dorsal and plantar flexion; patellar reflexes were 2+ and equal bilaterally; she walked stiffly; and she had tenderness over the lumbar spine and paraspinous muscles. (R. at 276.) Gipe diagnosed acute lumbo-sacral strain. (R. at 276.) On November 3, 2009, Wallen reported that her back was "completely fine." (R. at 281.) On February 2, 2010, Wallen was diagnosed with chronic cough, probable asthma and much improved hypercholesterolemia. (R. at 271.) On March 9, 2010, Dr. James Wesley Campbell, D.O., a physician with Appalachian Healthcare, reported that Wallen's respiratory examination showed her lungs to be clear to auscultation with good air entry. (R. at 278.) She had no wheezing, rales or rhonci. (R. at 278.) Wallen reported that her breathing was much improved with medications. (R. at 278.) On July 13, 2010, Wallen stated that she had no cough, complaints or concerns. (R. at 283.)

On July 12, 2011, Wallen complained of severe back pain when standing. (R. at 258.) Examination showed that Wallan had full forward flexion, backward extension, lateral bends and twists bilaterally; straight leg raising tests were negative; she had good dorsal plantar flexions of both feet; patellar reflexes were 2+ and equal bilaterally; her lungs were clear; and her extremities were without edema. (R. at 258.) On August 16, 2011, Wallen reported back pain. (R. at 257.) She stated that her medications helped a "little bit." (R. at 257.) Gipe reported that Wallen's back had full range of motion; straight leg raising tests were negative; her extremities had no edema; and she had tenderness over her left sacroiliac joint. (R. at 257.) Wallen's blood pressure reading was 160/100. (R. at 256.) X-rays of Wallen's lumbar spine showed mild osteopenia. (R. at 335.) On September 20, 2011, Wallen's blood pressure reading was 160/100. (R. at 256.) A bone DEXA

scan showed Wallen's overall bone density fell within the osteopenia range with increased fracture risk. (R. at 334.) On October 18, 2011, Wallen's blood pressure reading was 160/92. (R. at 255.) Gipe reported that Wallen's lungs were clear, and her extremities were without edema. (R. at 255.) On November 15, 2011, Wallen's blood pressure had improved with medication, her lungs were clear, and her extremities were without edema. (R. at 254.)

On May 15, 2012, Wallen complained of neck pain that "comes and goes." (R. at 251.) She stated that her medication helped, but that she did not like to take it a lot. (R. at 251.) Upon examination, although Wallen was mildly tender in her paraspinous cervical muscles, she had full range of motion in her upper and lower extremities and neck. (R. at 251.) Gipe diagnosed degenerative arthritis of the neck and back; mild intermittent asthma; contact dermatitis; osteoporosis; hypertension and hyperlipidemia. (R. at 251.) On July 27, 2012, Wallen complained of back pain. (R. at 267.) Upon examination, Wallen had full forward flexion, backward extension and negative straight leg raising tests. (R. at 267.) Although she had some tenderness and muscle spasms, her sensation was grossly intact. (R. at 267.) Gipe diagnosed acute lumbosacral strain. (R. at 267.) X-rays of Wallen's lumbosacral spine were normal. (R. at 269.) On August 21, 2012, Wallen reported a lot of pressure and pain in her lower back. (R. at 268.) She stated that she was doing better with physical therapy.[5] (R. at 268.) Gipe assessed that Wallen had a "pretty good" range of motion in her back. (R. at 268.) Although she had some

---

[5] Wallen received physical therapy for her complaints of back pain from Appalachian Physical Therapy & Sports Clinic from August 7, 2012, through September 26, 2012. (R. at 296-333.) Upon discharge, Wallen reported doing much better overall with her pain and function. (R. at 296-97.) She had normal range of motion and strength and reported that she was able to dress and bathe herself, as well as perform household chores. (R. at 296.)

-7-

tenderness over the lumbar spine, she had a normal gait and negative straight leg raising tests. (R. at 268.) On November 15, 2012, Wallen reported that her back was doing better. (R. at 341.) Her blood pressure was noted as "excellent," her lungs were clear, and her extremities were without edema. (R. at 341.)

On February 12, 2013, Wallen complained of back and leg pain. (R. at 346-47.) Upon examination, Wallen had pain with forward flexion; she was standing a "bit crooked;" she had some scoliosis of the spine; tenderness over the lumbar spine; and sensation was grossly intact. (R. at 347.) On March 4, 2013, an MRI of Wallen's lumbar spine showed mild degenerative disc disease without focal disc herniation or significant central canal stenosis. (R. at 336.) On March 15, 2013, Wallen reported that there were days that she was in "terrible pain" and had radiculopathy in her legs. (R. at 345.) Upon examination, Wallen's spine exhibited no abnormalities, and she had a normal gait and negative straight leg raising tests. (R. at 345.) Gipe noted that Wallen's left leg appeared to be about an inch and a half shorter than the right. (R. at 345.) On May 16, 2013, Wallen reported that she had been seeing a chiropractor[6] and was doing much better. (R. at 344.) Upon examination, her spine exhibited no abnormalities; she had full range of motion of the back and lower extremities; negative straight leg raising tests; and a normal gait. (R. at 344.) On November 19, 2013, Wallen's examination was normal. (R. at 342-43.)

On December 12, 2013, Gipe and Dr. Campbell completed a Physical Residual Functional Capacity Questionnaire, indicating that they had treated

---

[6] Wallen received chiropractic care at Cloverleaf Chiropractic from March 22, 2013, through December 3, 2013. (R. at 360-81.) Progress notes indicate that Wallen did well with treatment. (R. at 362, 365-67, 373.)

Wallen for back pain since July 2011. (R. at 383-87.)[7] They reported that Wallen's back examinations were normal except for occasional tenderness and spasm of the low back muscles. (R. at 383.) They reported that Wallen's pain frequently interfered with her ability to attend and concentrate. (R. at 384.) They opined that Wallen could walk for one city block without interruption. (R. at 384.) Gipe and Dr. Campbell opined that Wallen could sit up to 30 minutes and stand up to 10 minutes without interruption. (R. at 384.) They opined that Wallen could sit, stand and walk less than two hours in an eight-hour workday. (R. at 385.) They reported that Wallen would need a job that allowed her to shift positions to relieve the pain. (R. at 385.) They found that Wallen could "rarely" lift and carry object weighing up to 10 pounds. (R. at 385.) Gipe and Dr. Campbell found that Wallen could "rarely" twist, stoop and crouch; occasionally climb ladders; and frequently climb stairs. (R. at 386.) They opined that Wallen would be absent from work more than four days a month. (R. at 386.)

On June 21, 2012, Dr. Robert McGuffin, M.D., a state agency physician, found that Wallen had the residual functional capacity to perform light work. (R. at 74-76.) He found that Wallen could frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and never climb ladders, ropes and scaffolds. (R. at 75.) No manipulative, visual or communicative limitations were noted. (R. at 75.) Dr. McGuffin also opined that Wallen could not work around concentrated exposure to vibration, fumes, odors, dusts, gases, poor ventilation, hazardous machinery and heights. (R. at 76.)

---

[7] It appears from the record submitted that Dr. Campbell treated Wallen on only one occasion in 2010 for breathing problems. (R. at 278.) Nonetheless, Dr. Campbell also signed the December 12, 2013, Physical Residual Functional Questionnaire. (R. at 383-87.)

On January 29, 2013, Dr. Wyatt S. Beazley, III, M.D., a state agency physician, found that Wallen had the residual functional capacity to perform light work. (R. at 86-88.) He found that Wallen could frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and never climb ladders, ropes and scaffolds. (R. at 87.) No manipulative, visual or communicative limitations were noted. (R. at 87.) Dr. Beazley also opined that Wallen could not work around concentrated exposure to vibration, fumes, odors, dusts, gases, poor ventilation, hazardous machinery and heights. (R. at 88.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether

substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Wallen argues that the ALJ erred by failing to evaluate her transferable skills. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-10.) Wallen further argues that the ALJ erred by failing to consider the evidence provided by Gipe and Dr. Campbell. (R. at 10-14.)

Wallen argues that the ALJ failed to appropriately evaluate her transferable skills under Social Security Ruling 82-41. I find this argument unpersuasive. The regulations provide that skills are transferable "when the skilled or semi-skilled work activities [a claimant] did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. § 404.1568(d)(1) (2015). Transferability means "applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs." S.S.R. 82-41(2)(b), WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1975-1982 (West 1983). With respect to Wallen's particular age category, a person of advanced age, the regulations provide the following:

> If you are of advanced age … and you have a severe impairment(s) that limits you to no more than sedentary work, we will find that you have skills that are transferable to skilled or semiskilled sedentary work only if the sedentary

-11-

> work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.

C.F.R. § 404.1568(d)(4). Likewise, S.S.R. 82-41 provides that in order "[t]o find that an individual who is age 55 or over and is limited to sedentary work exertion has skills transferable to sedentary occupations, there must be very little, if any vocational adjustment required in terms of tools, work processes, work settings or the industry." S.S.R. 82-41(4)(c). As the ALJ pointed out, although some job skills are unique to a specific work process in a particular work setting, on the other hand, "where job skills have universal applicability across industry lines, such as clerical, professional, administrative, or managerial types of jobs, transferability of skills to industries differing from past work experience can usually be accomplished with very little, if any, vocational adjustment where jobs with similar skills can be identified as being within an individual's RFC." (R. at 27.) In Wallen's case, the vocational expert testified that her past relevant work as a bank teller generally is characterized as light work with an SVP of 5. (R. at 39.) The vocational expert further testified that the primary skills of the bank teller position were using math skills to keep records and handle money; using eyes, hands and fingers to operate keyboards and adding machines; knowledge of balance sheets and audit reports; and receiving and processing collection items or negotiable pieces such as checks and drafts according to bank regulations. (R. at 39-40.)

After the ALJ presented the sedentary residual functional capacity with no more than occasional exposure to pulmonary irritants, he specifically went on to

state that he needed positions that did not require much transition from a bank teller, and that if something required significant vocational adjustment, that he needed to "rule that out." (R. at 60.) The vocational expert testified that the mortgage closing clerk would have the least transferable skills, but then testified that the proof machine operator, the statement clerk and the collection clerk had similar transferable skills to Wallen's past relevant work. (R. at 60-62.)

The vocational expert testified with regard to the transferability of skills between Wallen's past relevant work and the three identified job positions. (R. at 39-40, 59-67.) He explained that, when considering transferability, he considered the work field, material products, subject matter and services. (R. at 65-66.) The vocational expert testified that all of the identified positions have the same material products, subject matter and services. (R. at 66.) Furthermore, the vocational expert also read the Dictionary of Occupational Titles, ("DOT"), descriptions to ensure that he was comfortable regarding an opinion on transferability, and that is why he excluded the mortgage closing clerk position, because it involved other financial aspects such as loans that would need to be learned. (R. at 67.) The ALJ found that the vocational expert's testimony showed that Wallen's previous work was so similar to the three jobs identified that Wallen would need to make very little, if any, adjustment in terms of tools, work processes, work settings or the industry. (R. at 27-28.) Based on this, I find that substantial evidence exists to support the ALJ's finding that a significant number of jobs exist that Wallen could perform.

Wallen further argues that the ALJ erred by failing to consider the evidence

provided by Gipe and Dr. Campbell. (Plaintiff's Brief at 10-14.) As stated above, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

The ALJ noted that he was giving Gipe's opinion "limited" weight because it was not supported by or consistent with her objective treatment notes. (R. at 25.)[8] The substantial evidence supports this weighing of the medical evidence. The ALJ further noted that Gipe indicated that Wallen's examinations were normal. (R. at 25.) In addition, there is no evidence that Gipe referred Wallen to a specialist. In August 2011, x-rays of Wallen's lumbar spine showed only mild osteopenia. (R. at 335.) In July 2012, x-rays of Wallen's lumbar spine were normal. (R. at 269.) In March 2013, an MRI of Wallen's lumbar spine showed mild degenerative disc disease without focal disc herniation or significant central canal stenosis. (R. at 336.) Furthermore, Wallen reported that her medications and physical therapy helped her pain, breathing and blood pressure symptoms. (R. at 251, 254, 257, 268, 278, 341, 344.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir.

---

[8] The ALJ refers to the Physical Residual Functional Capacity Questionnaire completed by Gipe and Dr. Campbell as Gipe's opinion. (R. at 24-25.) This appears reasonable in light of the lack of any recent treatment by Dr. Campbell.

1986). Furthermore, the assessments completed by the state agency physicians support the ALJ's weighing of the medical evidence and his finding as to Wallen's residual functional capacity.

Based on the above reasoning, I find that substantial evidence exists in the record to support the ALJ's finding that Wallen was not disabled. An appropriate Order and Judgment will be entered.

ENTERED: June 1, 2016.

s/ *Pamela Meade Sargent*<br>UNITED STATES MAGISTRATE JUDGE